Curry v. Brockway.

---

HANNAH L. CURRY, as Administratrix of the Estate of Milton S. Curry, Deceased, Appellant, *against* HORACE H. BROCKWAY, Respondent.

(Decided March 15th, 1883.)

In an action by an administratrix, the complaint alleged that defendant, knowing that the intestate was of unsound mind, and in fraud of him and of his creditors, induced him to execute and deliver to defendant an instrument purporting to transfer to defendant four horses; that no

delivery of the horses was made by the intestate during his lifetime; that after his death, defendant, in fraud of plaintiff, and of the creditors of the estate of the intestate, took possession of and removed the horses from the intestate's stables; that plaintiff had demanded from defendant the surrender of the horses, and that he had refused to surrender them, and had converted them to his own use. *Held,* that these allegations were not sufficient to set aside or avoid the instrument upon the ground that it was made with intent to defraud creditors of the intestate, no fraud on the part of the intestate being alleged; that the averments that defendant acted in fraud of the creditors of the intestate did not make it an action by the administratrix as a trustee for the intestate's creditors; that the cause of action alleged was the fraud practiced by the defendant upon the intestate, which, in itself, would render the transfer void; and that, upon such allegations, plaintiff could not recover on the ground that the transfer was made by the intestate to defraud his creditors, resting on the statutory presumption from a want of delivery and change of possession, since no such cause of action was set up in the complaint.

A distinguishing feature between the right of action by a personal representative where property was transferred by the deceased in fraud of his creditors, and the right of action for property or the value of property of which he was defrauded during his lifetime, is that if there are assets sufficient to pay the creditors of the deceased fraudulent grantor, the personal representative has no right of action as trustee for the benefit of creditors; whereas the other action is maintainable, although there may be ample assets to pay debts; and the two causes of action, consequently, cannot be united in one and the same count.

At the trial of an action brought by an administratrix for an alleged fraud practiced upon her intestate, by inducing him, while of unsound mind, to execute and deliver to the defendant a bill of sale of certain personal property, it appeared from the evidence on the part of the plaintiff that the bill of sale was given to secure an indebtedness of the intestate to the defendant; that, about the time when it was given, the intestate was suffering occasional interruption of the faculty of speech, loss of memory, liability to excitement, and other mental infirmities, probably as the effect of cerebral disease; but that he was, notwithstanding, able to and did attend to his business, every day, and, at about the time of giving the bill of sale, in another transaction the circumstances of which were testified to by one of the witnesses for the plaintiff, he exhibited the faculties of mind, memory and judgment, and the general intelligence of an ordinary man of business in the careful and judicious management of his affairs. *Held,* that this evidence was not sufficient to justify a verdict for the plaintiff, and that the complaint should be dismissed.

EXCEPTIONS taken at a trial term of this court, ordered to be heard, in the first instance, at the General Term.

The facts are stated in the opinion.

Curry v. Brockway.

CHARLES P. DALY, Chief Justice.—There are but two causes of action set up by the complaint. The first is, that the defendant, knowing that Curry was of unsound mind, and in fraud of Curry, and of Curry's creditors, induced him to execute and deliver to the defendant a bill of sale or some other instrument in writing, purporting to transfer to the defendant four valuable horses; that no delivery of the horses was made by Curry during his lifetime; and that, after his death, the defendant, in fraud of the plaintiff and *of the creditors of Curry's estate,* took possession of and removed them from the stables of Curry; and though the surrender of the horses had been demanded by the plaintiff, as the administratrix of the estate of Curry, the defendant refused to surrender them, and had converted them to his own use.

The second cause of action is simply for a taking by the defendant, after the death of Curry, of two whips, six blankets and a lap-robe, of the value of $50, belonging to his estate, which, although demanded of him by the plaintiff, the defendant refused to deliver.

The first cause of action is not an action to set aside or in avoidance of the bill of sale or instrument under which the defendant claims title to the horses, upon the ground that it was made with intent to defraud Curry's creditors. It is not averred to have been made in pursuance of a corrupt agreement for that purpose between Curry and the defendant; or that there was any fraud on the part of Curry. On the contrary, the fraud alleged is the fraud alone of the defendant, in inducing Curry, knowing that he was of unsound mind, in fraud of him and of his creditors, to execute and deliver to the defendant the bill of sale or instrument in writing purporting to transfer to the defendant the four horses. Averring that the defendant induced Curry to execute the instrument in fraud of Curry's creditors, as well as in fraud of Curry, and that after Curry's death the defendant, in fraud of Curry's creditors, removed the horses from Curry's stable, does not make it an action by the administratrix as trustee for Curry's creditors, which,

as will be hereafter shown, is an action different in its nature and in the nature of the remedy.

An action to recover property or its value, which the vendee fraudulently induced a person of unsound mind to transfer to him by a bill of sale or otherwise, may be brought in behalf of the person defrauded during his lifetime, or by his personal representative after his death, who recovers the whole of the property, or the value of it, as a part of the assets of the deceased's estate to which the administrator or executor has succeeded. The cause of action, in such a case, is the fraud practiced by the vendee upon the vendor, which in itself renders the conveyance or transfer void; and it is wholly immaterial in such an action, whether, in addition to defrauding the vendor, the vendee intended also to defraud the vendor's creditors. No inquiry in such an action is requisite as to the creditors of the deceased; nor is it material whether his estate be insolvent or not; for it is not upon that ground that the personal representative recovers the property or its value, but upon the ground, as I have said, that it is part of the deceased's estate, wrongfully withheld by the defendant, the instrument under which he claims title to it being, as against the vendor, absolutely void. This is the action and the only one which the plaintiff could support upon the averments contained in the first count of her complaint.

The action which an administrator or other personal representative may bring, where the deceased, in his life-time, disposed of property with intent to defraud his creditors, is one of a very different nature, which involves the application of principles and the existence of a state of facts not at all requisite in the other action. It is a well and long established principle of the common law, founded upon grounds of public policy, that a party to a fraudulent conveyance is, as respects himself, his heirs, executors, administrators or assigns, forever concluded by it; the policy of the law being to leave the parties to fraudulent conveyances in the position in which they have voluntarily placed themselves, and subject to all the consequences that may result

from their fraudulent act, the rule being that a fraudulent transfer is good as against the grantor, his heirs, executors, administrators, vendees, grantees, agents, and parties claiming under him (Bump on Fraudulent Conveyances 438, 439; *Jackson* v. *Garnsey*, 16 Johns. 189; *Osborne* v. *Moss*, 7 Johns. 161; *Hawes* v. *Leader*, Cro. Jac. 270; Yelv. 196; *Upton* v. *Bassett*, Cro. Eliz. 445; *Kellinger* v. *Riedenhauer*, 6 Serg. & R. 535; *Reichart* v. *Castator*, 5 Binn. 112; *Hall* v. *McAnulty*, 4 Yates 49; *Pringle* v. *Pringle*, 59 Pa. St. 286; *Walls* v. *Provident Inst. for Savings*, 85 Mass. 96; *Buehler* v. *Gloninger*, 2 Watts 226; *Law* v. *Smith*, 4 Ind. 61); which general rule, however, has been limited in this state to *executed* conveyances, and held not to apply in the case of executory agreements (*Nellis* v. *Clark*, 20 Wend. 24, in error, 4 Hill 424; *Mosely* v. *Mosely*, 15 N. Y. 335.)

After the passage of the English statute of frauds, 13 Eliz. c. 5, the general rule above referred to was modified in conformity with the provision in that statute, which declared such fraudulent conveyances or transfers to be void as against creditors; and it was consequently held that the administrator or other personal representative of one who had transferred his property to defraud creditors, was to be regarded in the administration of the estate of a deceased fraudulent grantor as in the position of a trustee for the benefit of creditors; and if there were not assets sufficient to pay the deceased's debts, that he might maintain an action against the fraudulent vendee, to recover from him, at least so much of the value of the property fraudulently conveyed as might be requisite to satisfy debts for the payment of which there were no assets (*Walls* v. *Provident Inst. for Savings*, 85 Mass. 96; *Pringle* v. *Pringle*, 59 Pa. St. 286; *Bate* v. *Graham*, 11 N. Y. 237; *Babcock* v. *Booth*, 2 Hill 181; *Hawes* v. *Leader*, Cro. Jac. 270); or a creditor of the deceased might maintain an action against the fraudulent vendee as an executor *de son tort* who was answerable for the debts of the deceased, to the extent of the property which had wrongfully come into his possession, upon the assumption that, the transfer being void, the property was

to be regarded as assets of the deceased; in respect to which, having intermeddled with it, he might be treated as an executor *de son tort* (*Hawes* v. *Leader*, Cro. Jac. 270; Yelv. 196; *Edwards* v. *Harben*, 2 Term 597; *Bessel* v. *Stanhope*, Cro. Eliz. 810; *Osborne* v. *Moss*, 7 Johns. 164; *Ashby* v. *Child*, Style 384)); which, however, cannot be done in this state since the Revised Statutes, (2 Rev. Stat. 449, § 17) which has taken away this remedy, and given the right of action to the personal representatives of the fraudulent vendor, who are, by this statute, constituted trustees for the benefit of creditors, and who may sue or controvert the validity of the transaction in any other legal form, where that course is necessary for the payment of the debts of the deceased (*Babcock* v. *Booth*, 2 Hill 185; *Dox* v. *Backenstose*, 12 Wend. 543).

Where the action was brought by the personal representatives, to recover the value of the property transferred by the deceased, in fraud of creditors, it was necessary to aver the want of or a deficiency of assets to pay creditors, and also to aver the extent of the debts for the payment of which there were no assets; that the remedy might be adequately applied; for a recovery of the value of the property fraudulently disposed of could only be to the extent of the debts for the payment of which there were no assets (*Buehler* v. *Gloninger*, 2 Watts 226; *Stewart* v. *Carney*, 6 Watts 445; *Pringle* v. *Pringle*, 59 Pa. St. 286; *Hawes* v. *Leader*, Cro. Jac. 270). And it has even been held that the action is not maintainable by the personal representative until he has exhausted the other property of the deceased (*Law* v. *Smith*, 4 Ind. 56), for, if he has assets sufficient in his hands to satisfy creditors, the fraudulent transfer cannot be disturbed (*Hawes* v. *Leader*, Cro. Jac. 270; *Hess* v. *Hess*, 19 Ind. 238); being good as against the grantor, under the rule above stated, and all other parties except creditors.

A distinguishing feature therefore between the two actions is that if there are assets sufficient to pay the creditors of the deceased fraudulent grantor, the personal rep-

Curry v. Brockway.

resentative has no right of action as trustee for the benefit of creditors; whereas the other action is maintainable, although there may be ample assets to pay debts, as the property in that case goes to the heirs: and the two causes of action, consequently, cannot be united in one and the same count, and were not in this case; for the plaintiff, to support her complaint, had to prove that the defendant obtained the bill of sale of the horses from Curry, knowing that he was of unsound mind, and incapable of contracting, that being the only fraud alleged; and if she proved this, she was entitled to recover the full value of the horses, with interest. What, however, she sought to do, as the horses after the sale remained in Curry's stable, was to recover upon the ground that the sale of them to the defendant was made by Curry to defraud his creditors, resting upon the statutory presumption that may be drawn from a want of delivery and change of possession; the difficulty in respect to which is, that no such cause of action was set up in the complaint. If the complaint had averred that the bill of sale was made with intent to hinder, delay or defraud creditors, and therefore void as against them, the plaintiff, to entitle her to recover the value of the property or any part of it, as a trustee for the creditors, must have averred, in addition, that there were not sufficient assets to pay creditors, to show that she was entitled to receive the whole value of the property, or so much of it as might be necessary to pay debts for the payment of which there were no assets, the fraudulent sale being void as to creditors, although good as to the vendor, and binding upon his personal representatives under the statutory rule before stated, which has not, in my judgment, been abrogated or impaired by anything contained in the Act of April 17th, 1858 (L. 1858, 506).

To render the bill of sale void as to creditors, the fact of a fraudulent *intent in making it*, must be shown (*Wilson* v. *Forsyth*, 24 Barb. 105; *Meux* v. *Howell*, 4 East 1; *Holbird* v. *Anderson*, 5 Term 255); and if it was obtained by a fraud upon the vendor, though the effect of it may be to

diminish his means of paying his creditors, that does not give creditors the right to have it set aside as fraudulent (Bump on Fraudulent Conveyances, 2nd ed. 18); or if the intent on the part of the vendee in this case was not only to defraud the vendor, but his creditors, by fraudulently obtaining property from him that might otherwise have been applied to the payment of his debts, it would be, as I have said, immaterial, for the administratrix would still have to prove what she averred, that the bill of sale was obtained by the defendant from Curry, knowing that Curry was of unsound mind and incapable of contracting; and doing this, she would recover the whole of the property or the value of it as assets of which Curry had never been lawfully divested by any act of his own, and which she was entitled to recover as administratrix; so that the only question under this count, is whether the evidence given shows that Curry was mentally incapable of contracting when he gave the bill of sale. As regards the other count, which is not for a wrongful taking, but for a wrongful detention of certain articles, there was no evidence in the case that they had been demanded of the defendant, as averred in the count, and that he had refused to surrender them; so that, this cause of action not being proved, the only question is whether the judge was justified in dismissing the complaint, upon the ground of the insufficiency of evidence given, to establish that the deceased was *non compos mentis* when he gave the bill of sale, and that the defendant knew it when he obtained the instrument from him.

The law upon this inquiry may be briefly stated. The essence of every contract is consent, and if a party to a contract was incapable of understanding the nature of it, from idiocy, lunacy, mental imbecility, or other infirmity, this essential element is wanting; and therefore, if the party obtaining the contract knew that the other party was imbecile, insane, or so impaired in intellect as not to be conscious of what he was doing, it would be regarded as having been procured from him by fraud, and therefore

void. It is the fraud practised, by obtaining a contract from a person known to be incapable of making one, that renders it void; for it is not every contract that is made by a person *non compos mentis* that is void or voidable; for, in some cases, as where the contract is for necessaries, it would be upheld (*Sentance* v. *Pool*, 3 Carr. & P. 1; *Brown* v. *Jodrell*, Id. 30; 1 Moody & M. 105; *Baxter* v. *Earl of Portsmouth*, 7 Dowl. & R. 617; 5 Barn. & Cr. 170; 2 Carr. & P. 278; *Levy* v. *Baker*, 1 Moody & M. 106, note B.; Sheperd on Lunacy, 412, 414, 446; Stock on Non Compotes Mentis, Book I, c. § 2; Story on Contracts, c. II).

The essential inquiry, therefore, in the present case is, whether the evidence shows that Curry was, by reason of mental infirmity, wholly incapable of contracting, and that the defendant knew it when he obtained the bill of sale; and after going over the whole of the voluminous evidence in this case, there was not, in my opinion, sufficient to sustain a finding by the jury to that effect. If it had been shown that Curry was insane and had lucid intervals, a contract made in a lucid interval would be valid; but the *onus* would be on the party for whose benefit the contract was entered into, to show that it was made in a lucid interval (*Att. Gen.* v. *Parnther*, 3 Bro. 443; Story on Contracts, § 36).

It is not, however, claimed that Curry was insane. Dr. Watson, the only expert in the case, testified that he did not regard him as insane, but merely that his mind was impaired. His wife testified that she was thoroughly convinced that he was insane, because he made a trade, in Jersey City, of a team for horses, the team being worth twice as much as the horses, and that he gave a double set of harness to boot; but she did not state when he did this; whether it was before or after the making of the bill of sale; and she was not an expert upon the question of insanity.

The doctor who was called as an expert and who had been Curry's physician for two years, and up to the time of his death, said that he did not regard his case as one of insanity,

but as a perturbed state of his brain, which did not really make him insane, but put him in a very excitable and very unsteady nervous condition, together with loss of memory and, *to some extent*, the power of coördination, which he explained by stating that those muscles which should be under the control of the will, would not respond to the will, and which, he said, was not particularly any indication of insanity; nor was the dragging which he had in his gait; nor the loss or impairment of his memory; these infirmities being only an indication of a weakened condition of the brain-force; and, finally that it was a .case of cerebral derangement but not of mental derangement; that there was a distinction between the two.

It appeared that the bill of sale, although absolute upon its face, was in reality given as security for money due by Curry to the defendant; and that after Curry's death, the defendant told the plaintiff, that he had a bill of sale for $900; that he proposed to sell the horses, as rapidly as possible, and that every dollar over that amount should go to her; and that he thought any one of the horses ought to pay his bill.

It further appeared that, after Curry's death, the defendant told the witness Vanderpoel, that the claim he had on the bill of sale was $725. It was also shown that the value of the horses was about $2,220; and that they were removed by the defendant from the stable two days before Curry's death; which relieves the case of any question that might arise, if the removal had been, as averred in the complaint, after Curry's death; the rights of the plaintiff as administratrix relating back to and having effect from the time of his decease.

There is nothing in itself questionable, in the circumstance of the defendant's obtaining a bill of sale from Curry, as a security for the amount due him, whether it was $900 or $725. It could be objectionable only if Curry, when he gave it, was incapable of understanding what he did, and if the defendant knew it. In support of that assumption the expert, his physician, Dr. Watson, testified, that in his

opinion, from the 16th of September, 1880, and up to the time of his death, which occurred on the 12th of November following, Curry was not in a condition to act intelligently, or to conduct business safely or properly; that there was combined in his case, loss of control of motion, loss of memory, occasionally a wild and anxious expression, with the existence of the disease, congestion of the brain, and cerebral trouble, manifested by his getting wonderfully excited from trivial causes and becoming furious, so as to produce bodily injury to those about him, without sufficient cause. He testified that he noticed a gradual change in his power of locomotion, in his speech, and in the appearance of his eyes; in the loss of memory, denoting a gradual increase of this disease of congestion of the brain; and that, from all he saw in his case and from his knowledge in medical science, he was of opinion that his mind was impaired so as to render him unfit to attend to business, in the month of October, 1880; which would cover the period when the bill of sale was given, it being admitted that it was executed and delivered on the 25th of that month.

This witness underwent a very extended examination, as to his medical qualification to pronounce positively upon the nature, extent and effect of Curry's mental infirmity; which showed that upon delicate and difficult inquiries of this kind, he was not an expert, who had made the subject a particular study, or who had a very extended practical experience; for, from his own statement, his reading had been limited to Beck's Medical Jurisprudence, a work of Dr. Hammond, and a few monographs on insanity and mental diseases; and that the cases of mental diseases which he had treated were nervous diseases, such as would be ordinarily treated by a regular practitioner; that he had never treated insane people, except cases of insanity where the patient was kept at home, and treated by care and nursing; and, of this number, only four or five, during a practice of thirteen years in this city, and fourteen or fifteen out of it anterior to that time; and that the knowledge upon which he was able to give an opinion, was based, as far as the

practical part was concerned, on these four or five cases, within the thirteen years he had practised in this city and the other cases prior to that time. He was examined very thoroughly as to what he had observed and knew, respecting the mental condition of Curry, on which he based his opinion that his mind was so impaired as to make him unfit to attend to any business; and his evidence substantially was this: that Curry would be suddenly taken with a stoppage of speech; that he had not at all times the control of his muscles either in walking or in speaking; that Curry complained to him, that often whilst he was talking, his tongue would be arrested, and he could not utter a sound, which the doctor regarded as a deepening of his congestive condition, producing an arrest of the nervous power; that sometimes, for five or even ten minutes, he could not utter a word; that Curry told him that, if he did not get better of this, he would be unable to conduct his business, because if he were showing a pair of horses to a man, and talking about their qualities, his speech would be arrested, and he appeared like a fool; that Curry complained of this stoppage of speech in June, which was rather slight at first, but increased upon him, both as regards its frequency and the duration of it; that, about the 20th or 21st of September, he had one of those interruptions in his speech, in the doctor's office, which lasted for about fifteen minutes; that Curry was very anxious and worried about it, but the doctor told him to keep cool and very shortly his speech would return, which it did; that he then told Curry that this infirmity was increasing upon him, and that, if he was careful, and let stimulants alone, he might get over it. That this stoppage of speech made Curry nervous and excitable; that it made him look wild and anxious, and also affected his memory. That in the early part of October he complained of being chilly, when he went out into the air; complained of a great deal of pain in his head, when out in the cold air; and that, up to this time, he had been, as the doctor expressed it, " a steady drinker." He testified further that, on the 20th of October or thereabouts, Curry came to his office in a great state

Curry v. Brockway.

of excitement and very much worried, complaining of the loss of $200; saying that he had it the previous night in his vest pocket; that his wife must have got it; that he had examined every place where he might have left it and could not find it; that he, the witness, went on the following day to Curry's house, and told him that he did not think that his wife had got the money, that he would find it yet, and left him; and two or three days after, Curry came to his office and said that he had found the money exactly where he had left it, between the back and seat of an old sofa, in his house; that it came to him like a flash where he had laid it. This supposed loss and subsequent finding of $200, was one of the circumstances to which the witness attached great weight. The finding of the money, it would seem from the testimony of this witness and that of Curry's wife, was about the time that the bill of sale was executed, or not later than two days afterwards.

In addition to what is above stated, the doctor also testified that Curry complained to him that he had difficulty in remembering what men said to him about his business affairs, and what he said to them in matters of trading and dealing; and that he could not remember what was going on with them from day to day; and complained of this, as a loss that annoyed him very much, and of which he seemed to be conscious, showing, as the witness said, that his memory was not entirely impaired; that Curry did not remember visits that he had made to the doctor's office; and that the doctor recalled these visits to him to test his memory; and that he did not remember them. The doctor further testified that he thought Curry's "libations—the act of drinking"—had a tendency to excite his brain, to a certain extent, and increase the congestion existing there; that one of the indications was a violent, turbulent state of his mind upon very trivial causes, which Curry himself tried to explain away and to make amends for, "because he was so foolish." The doctor testified that he considered these occasions were generally the result of Curry's drinking to excess for some length of time, as, for a week; that he

was more liable to have this condition of mind at such times; that the results would be, that after a certain accumulation of liquor, he would become excited; and that on these occasions, he would be turbulent and disorderly; that he made assaults upon his wife, and said himself afterwards, that she had not given him any cause for provocation.

What is above recited, is substantially the facts upon which the doctor's opinion was based.

A witness named Shipman, who had business transactions with Curry and who saw him frequently during the three last months of his life, was examined. He testified that when Curry would be talking to him, his tongue would get thick, and he could not understand what he would say; that he would talk about half-a-dozen different things at once; go from one subject to another constantly, sit in his chair asleep about half the time, which was not natural to him; and that the witness had to speak to him half-a-dozen times before he would notice him at all; that he complained about his head a great deal, and said he did not know half the time what he was doing; that he walked like a man half drunk, though not under the influence of liquor; shuffled his feet along; and that the witness formed the opinion that he was not rational. That he noticed these peculiarities about a month or six weeks before he died; about the middle of October, when he tried to buy horses from him. This witness, upon his cross-examination, admitted that the difficulty of articulation was an occasional and not an habitual one, and he could name only one occasion when he noticed it, and could not state that he observed it more than twice. He testified, that, about the middle of October, and after he had observed what is above stated, he would have bought some horses from him that he came to buy, if he and Curry could have agreed upon the terms. He said that, on this occasion, he wanted to buy them, but Curry said he wished him to wait a day or two, as he thought he was going to sell them for $750; that he expected to sell them to a party in Irving Place, whose name he did not disclose. So that, notwithstanding the

peculiarities he observed, he fully recognized, at this time, Curry's ability to transact business, and was quite willing to do business with him, if they could have agreed upon the price of the horses.

The testimony of Mrs. Curry was to the same general effect, as to Curry's occasional difficulty in articulating, or suspension of the power of speech; forgetting things that he had said, or directed to be done, and afterwards asking why they were done; that he could not depend upon his memory; that he would ask her to remember things for him in his business, and would forget the days of the week; assaulting her, and upon one occasion severely, without cause, for which assault she had him arrested and convicted; upon which arrest, the reason he gave for what he had done, was jealousy. That he went with her, on the 23d of October, to the Herald office, and when he got back, forgot that he had been there; that he asked her idiotically, like a child, if he could go there with her; that, in going there, he led her by the hand, and ran part of the time, and came back in the same way, running like a little child and holding her hand; that, on the same night, he came into the house, and went to bed with his clothes on, about six o'clock in the evening; that when a lady came in, who lived next door, and she brought her into the room, he covered up his head with the bed clothes; that the lady spoke to him two or three times; that the only answer he gave was: "Oh! I am so cold," and that he laid all night in the bed with his clothes on. That, on the morning after, he complained of the loss of the money referred to, and said to her: "Give me my money, or I'll murder you;" that she called to her landlady to come in, which she did, when Curry went away, and that when he returned, the same day, he was perfectly docile. That, on the morning of the 25th of October, she went to the stable; that Curry was there, and she asked in his presence if he had lost any money; that he was very docile, looked at her, and kept rubbing and looking at his hands all the time; that he stood there "stupid like and idiotic;" that she did not see him

again until the morning of the 27th, when he returned to the house, and seemed, as she said, to have come to his reason, telling her that he knew where his money was; and she saw him go to the sofa-lounge and take it out.

She further testified that he was in the habit of talking to himself about things she did not understand; that she had heard him try to preach; heard him pray, and swear about himself, worse than he did about any one else, all in about fifteen minutes; and that this occurred in May or June. The assault upon her, for which she had him arrested, was in April; when, she says, he sprang at her like a tiger, choked her and knocked her down; and that, when arrested, he claimed as the reason for doing this that he was jealous of the defendant. That he had assaulted her before, but that these assaults were not serious.

It further appeared that, although Curry was laboring, probably as the effect of his disease, under the infirmities described, of occasional interruption of the faculty of speech, loss of memory, and liability to excitement, he still attended to his business every day until eight days before his death, when he was taken with convulsions, and at the end of that period died. It further appeared that about the time this bill of sale was executed, he sent for Doctor Lesser, a veterinary surgeon, to examine a team of horses that he wanted to sell, and the sale of which had been prevented by an unfavorable opinion as to their soundness, by another veterinary surgeon, Dr. Leotard. This interview, Dr. Lesser, the veterinary surgeon, said, took place towards the end of October within a day or two of the 27th, or, as he said, very likely after, as he did not keep a note of it and could not give the exact date. He said that, at this interview, his attention was called particularly to the horses by Curry, as Dr. Leotard had examined them; that Curry told him that Dr. Leotard, after examining them, had said they were unsound, making some allusion to a hock joint curby, or an enlargement of the shoot of a tendon, as the doctor described it, running down the back portion of the os calcis and the hind leg; that the curb complained of was

Curry *v.* Brockway.

a thickening of the shoot, the external symptom of which is an enlargement from heat, in the limb. That in consequence, he examined the horses very carefully, and pronounced them sound, giving them a general examination, and an especial one as to the curb, Curry having told him that Dr. Leotard said that the horse was curby; and that he, the witness, after his examination, pronounced the horses perfectly sound. He was asked on his cross-examination to give everything that took place at this interview, and he testified: "I came in the stable and Curry said: 'I want you to look over a team of horses, over here, for me, that Dr. Leotard has declared unsound, and said is curby around the hocks;' that he showed him the horses alluded to, that they were brought out, that the witness examined them, and then said to Curry: 'These horses are perfectly sound, and if you require it, I will give you a certificate to that effect,' and that Curry said: 'Well, Leotard has lost me the sale of them by declaring them unsound; Mr. Osgood was going to purchase them. However, if I satisfy Mr. Osgood that they are sound, Osgood will buy them in spite of Dr. Leotard's certificate to the contrary;'" and the witness testified that this interview occurred after he had observed the difficulty which Curry had in articulating, to which the witness had previously testified.

This interview with the veterinary surgeon, occurring about the same time or very near the time when the bill of sale was executed, shows that, whatever may have been the mental infirmities of Curry, such as his occasional loss of speech, occasional loss of memory, liability to excitement, and the other infirmities detailed in the evidence, he was, notwithstanding, able to attend to his business, exhibiting on this occasion the faculties of mind, memory and judgment, and the general intelligence of an ordinary man of business, in the careful and judicious management of his affairs. With this evidence in the case, given by one of the plaintiff's witnesses, and which must be taken to be as true as any of the evidence given by them, there being nothing in the case to raise any doubt or question respecting it, the

jury would not have been justified in finding upon the other evidence, as matter of fact, that when Curry executed the bill of sale, which was on or about or very near the same time—that is, on the 25th day of October, 1880—that his mind was so greatly impaired, diseased and unsound, that he had not sufficient intelligence, perception, memory and judgment to know what he was doing, which they would have to find, to justify their rendering a verdict for the plaintiff. To set aside, upon this assumption or conclusion, an instrument given as security for a debt, the existence of which, at least to the amount of $725, is not controverted by the plaintiff's evidence, would require testimony much more certain and satisfactory than the other evidence in the case.

It will therefore be unnecessary to refer to the testimony to show what knowledge the defendant had of Curry's condition, there being a failure to establish the principal fact that he was, from mental imbecility or unsoundness of mind, incapable of contracting when he executed the bill of sale.

I am therefore of opinion that the exceptions should be overruled and judgment rendered for defendant dismissing the complaint.

VAN BRUNT and BEACH, JJ., concurred.

Exceptions overruled, and judgment accordingly.